IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JAMES DE LA CRUZ,

          Plaintiff,

    v.

KILOLO KIJAKAZI, Acting Commissioner of Social Security,

          Defendant.

Case No. 20-cv-05852-MMC

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 29, 33

Before the Court is plaintiff James De La Cruz's ("De La Cruz") motion for summary judgment, filed July 6, 2021, by which De La Cruz seeks review of a decision issued March 30, 2020, by an administrative law judge ("ALJ"), denying his claim for Social Security supplemental security income ("SSI"). Also before the Court is the cross-motion for summary judgment, filed September 2, 2021, by defendant, the Acting Commissioner of Social Security ("Commissioner"). Pursuant to Civil Local Rule 16-5, the motions have been submitted on the papers without oral argument. Having read and considered the parties' respective written submissions, the Court rules as follows.

## BACKGROUND

On June 19, 2018, De La Cruz filed an application for SSI, based on schizophrenia and depression, alleging a disability onset date of October 12, 2007, which he subsequently amended to June 19, 2018. On October 23, 2018, the Social Security Administration ("SSA") denied De La Cruz's application, and, on February 8, 2019, denied his request for reconsideration. Subsequently, De La Cruz requested a hearing before an ALJ. On November 19, 2019, the ALJ conducted a hearing, at which De La Cruz and a medical expert retained by the SSA, Kent B. Layton, Psy.D. ("Dr. Layton"),

testified.

At the hearing, De La Cruz testified he "hear[s] voices," "can't focus," and "ha[s] depression" (see Administrative Record ("AR") 1291). Specifically, De La Cruz testified that he "start[s] . . . talking to the voices" (see AR 1292), that medication helps "a little bit" but he still hears voices about "three times" per week (see AR 1292), that the voices are "very distracting" (see AR 1293), that he "feel[s] like the TV's talking about [him]" (see AR 1293), that he "can't get dressed" due to the voices (see AR 1294), that he does not "really like going out [of the house] because . . . it starts getting hard for [him] to concentrate" (see AR 1296), and that therapy is "going pretty good" but he "still ha[s] mood swings" (see AR 1297). Thereafter, Dr. Layton testified that although he saw a diagnosis of schizophrenia in the record, he "believe[d] it's more a substance-induced psychosis" (see AR 1301-02), and that "last [he] saw, there's a 32 percent misdiagnosis for schizophrenia" (see AR 1312), although he did not submit the supporting article for the record. Following the hearing, the ALJ conducted a supplemental hearing on March 6, 2020, at which De La Cruz and a vocational expert ("VE") testified.

At the supplemental hearing, De La Cruz testified that he last engaged in substantial gainful activity[1] in 2006 while working as a packager at a distribution center for an electronics company (see AR 49, 63), that he last took public transportation in 2017 (see AR 53), that two months prior, he "started attending classes" for six hours per week at a nearby community college (see AR 54, 58), and that, because he "would get lost" driving to "unfamiliar places," the only places he drives to alone are school and his therapist's office, both located about three to four miles from his home (see AR 52-53). Thereafter, the ALJ posed a series of hypothetical questions to the VE, inquiring about De La Cruz's ability to perform his past work as a packager, with specified limitations. In response, the VE testified De La Cruz could perform his past work as a packager, as well

_____

[1] The SSA defines "substantial gainful activity" as "work activity" that "involves doing significant physical or mental activities" and that one "usually do[es] for pay or profit, whether or not a profit is realized." See 20 C.F.R. § 416.972(a)-(b).

United States District Court
Northern District of California

1    as other work, specifically, floor attendant, checker weigher, and bag loader, provided

2    such work was limited to "perform[ing] simple, routine, repetitive tasks, consistent with . . .

3    SVP Levels 1 and 2,[2] done by rote, with few changes, if any, and little independent

4    judgement, if any[,] [as well as] little contact with others, [i.e.,] up to one third of an eight

5    hour workday [as to] coworkers and supervisors, and only brief and rare contact with the

6    general public[,] [i.e.,] no more than 5% in an eight-hour workday"; additionally, "there

7    would not be high production quotas in performing the job, and the job would not be done

8    rapidly" and "the hypothetical individual would be off-task less than 10% of an eight-hour

9    work day, and absent [no more than] once per month." (See AR 65-68.)  Lastly, in

10   response to several follow-up questions from the ALJ and De La Cruz's attorney as to the

11   impact of his being absent "beyond one time per month," being late "four times a month

12   or more," or being able to "respond to a criticism from supervisors only occasionally[,]

13   [i.e.,] a maximum of 33% of the time," the VE testified De La Cruz "would not be able to

14   maintain competitive employment."  (See AR 70-72.)

15        On March 30, 2020, the ALJ issued his decision, finding, based on the five-step

16   sequential evaluation process set forth in the Code of Federal Regulations,[3] De La Cruz

17

18        [2] The SSA defines Specific Vocational Preparation ("SVP"), as "[t]he amount of
     time required for a typical claimant to: [l]earn the techniques, [a]cquire the information,
19   and [d]evelop the facility needed for average performance in a job."  See SSA Program
     Operations Manual DI 25001.001A.77,
20   https://secure.ssa.gov/apps10/poms.nsf/lnx/0425001001#a77 (last visited May 9, 2022).
     SVP Level 1 means a "[s]hort demonstration only" is required, and SVP Level 2 means
21   "[a]nything beyond [a] short demonstration up to and including 1 month" is required.  See
     id.

22        [3] The "five-step sequential evaluation process" for disability determinations "ends
23   when the ALJ can make a finding that the claimant is or is not disabled."  See Woods v.
     Kijakazi, --- F.4th ----, 2022 WL 1195334, at *2 n.1 (9th Cir. Apr. 22, 2022).  "At the first
24   step, a claimant doing substantial gainful work activity is not disabled.  At the second
     step, a claimant is not disabled unless [he/she] has a medically determinable physical or
25   mental impairment or combination of impairments that is severe and either lasts at least a
     year or can be expected to result in death.  At the third step, a claimant is disabled if the
26   severity of [his/her] impairments meets or equals one of various impairments listed by the
     Commissioner of Social Security, 20 C.F.R. pt. 404, subpt. P, app. 1.  At the fourth step,
27   a claimant is not disabled if [his/her] residual functional capacity allows [him/her] to
     perform [his/her] past relevant work.  At the fifth step, a claimant is disabled if, given
28   [his/her] residual functional capacity, age, education, and work experience, [he/she]
     cannot make an adjustment to other work that exists in significant numbers in the national

was not disabled.  At step one, the ALJ determined De La Cruz had "not engaged in substantial gainful activity since June 19, 2018, the application date."  (See AR 22.)  At step two, the ALJ found De La Cruz had four "severe impairments," namely, "unspecified schizophrenia spectrum and other psychotic disorder, unspecified depressive disorder, borderline intellectual functioning, and past alcohol and polysubstance abuse."  (See AR 22.)  At step three, the ALJ determined De La Cruz did "not have an impairment or combination of impairments that me[t] or equal[ed] a listed impairment."[4]

In that regard, with respect to Listings 12.03, 12.04, and 12.11, the ALJ appeared to accept that De La Cruz's impairments satisfied the paragraph A criteria, which "includes the medical criteria that must be present in [the claimant's] medical evidence." See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A)(2)(a).

Next, the ALJ found De La Cruz's impairments did not satisfy the paragraph B criteria, which require that a claimant's impairments "result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning," namely, the ability to (1) "[u]nderstand, remember, or apply information," (2) "interact with others," (3) "concentrate, persist, or maintain pace," and (4) "adapt or manage oneself."  See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A)(2)(b).[5]  In particular, the ALJ found De La

economy."  See id. (internal quotations, citations, and alteration omitted).

[4] The ALJ considered whether De La Cruz's impairments, singly and in combination, met or equaled the criteria of the following listed impairments under 20 C.F.R. pt. 404, subpt. P, app. 1: "schizophrenia spectrum and other psychotic disorders" ("Listing 12.03"); "depressive, bipolar and related disorders" ("Listing 12.04"); "intellectual disorder" ("Listing 12.05"); and "neurodevelopmental disorders" ("Listing 12.11").  (See AR 23.)  Here, De La Cruz challenges the ALJ's findings only as to Listings 12.03, 12.04, and 12.11.  Listings 12.03 and 12.04 "have three paragraphs, designated A, B, and C" and, in order to meet or equal the criteria of those listings, a claimant's impairments "must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C."  See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A)(2).  Listing 12.11 "ha[s] two paragraphs," and, in order to meet its criteria, a claimant's impairments "must satisfy the requirements of both paragraphs A and B."  See id.

[5] The SSA defines "moderate" limitation as functioning that is "fair," "marked" limitation as functioning that is "seriously limited," and "extreme" limitation as "not able to function."  See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(F)(2)(c)-(e).

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Cruz had "moderate" limitation in each of the four areas of mental functioning.  (See AR

2   23-24.)

3         Lastly, the ALJ found De La Cruz's impairments did not satisfy the paragraph C

4   criteria, which require a "medically documented history of the existence of the mental

5   disorder in the listing category over a period of at least 2 years," as well as evidence

6   showing such claimant "reli[es], on an ongoing basis, upon medical treatment, mental

7   health therapy, psychosocial support(s), or a highly structured setting[], to diminish the

8   symptoms and signs of [his/her] mental disorder," and that despite "diminished symptoms

9   and signs," the claimant has "achieved only marginal adjustment."  See 20 C.F.R. pt. 404,

10  subpt. P, app. 1, § 12.00(G)(2)(a)-(c).[6]  In particular, the ALJ found De La Cruz "has not

11  had medical treatment, mental health therapy, psychosocial support, a highly structured

12  setting that is ongoing, or a minimal capacity to adapt to changes in environment or to

13  demands that are not already part of daily life."  (See AR 25.)

14        Before continuing to step four, the ALJ determined De La Cruz's "residual

15  functional capacity" ("RFC")[7], and, in that regard, found De La Cruz could perform "a full

16  range of work at all exertional levels but with the following nonexertional limitations":

> The claimant is able to perform simple, routine, and repetitive tasks
> consistent with Specific Vocational Preparation (SVP) level 1 & SVP level 2,
> done by rote, with few changes, if any, little independent judgment, if any,
> and little contact with others.  By little contact with others, it is meant up to
> one third of an eight-hour workday as to co-workers and supervisors, and
> only brief and rare (5% of an eight-hour workday) contact with the general
> public.  There would not be high production quotas in performing the job and
> the job would not be done rapidly.  The multiple restrictions in his mental
> residual functional capacity are designed to create a low stress working
> environment where he could perform simple tasks over and over again.  He
> should not travel to unfamiliar places.  He would be off task less than 10%
> of an eight-hour workday and absent once per month.

---

[6] The SSA defines "marginal adjustment" as "minimal capacity to adapt to changes
in [claimant's] environment or to demands that are not already part of [claimant's] daily
life."  See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(G)(2)(c).

[7] RFC is "the most [the claimant] can still do despite [his/her] limitations."  See 20
C.F.R. § 416.945(a)(1).

1    (See AR 27.)  In determining De La Cruz's degree of functional limitation and RFC, the

2    ALJ considered a number of medical opinions and records.

3           The ALJ found most "persuasive" the medical opinions of Robert Clanton, Ph.D.

4    ("Dr. Clanton") and Jennifer Wigton, Ph.D. ("Dr. Wigton"), two state agency psychological

5    consultants who reviewed De La Cruz's records, the former on October 15, 2018, for

6    purposes of an initial disability determination, and the latter on February 5, 2019, for

7    purposes of reconsideration.  (See AR 30, 87, 103.)  Dr. Clanton and Dr. Wigton were of

8    the same opinion; both, as noted by the ALJ, "cited to evidence of cooperative behavior,

9    the absence of special education, and evidence that [De La Cruz] could purchase food at

10   the mall" (see AR 31) to support their opinions that De La Cruz "could understand,

11   remember, and carry out a two-step command involving simple instructions with limited

12   public contact" (see AR 30).  Both Dr. Clanton and Dr. Wigton further opined that De La

13   Cruz had "moderate" limitation in each of the four areas of mental functioning.  (See AR

14   86, 103.)

15          Additionally, the ALJ found "persuasive overall" the medical opinion of Dr. Layton,

16   who, at the hearing on November 19, 2019, as noted by the ALJ, "cited to evidence of

17   [De La Cruz's] low average full scale IQ of 85 and normal mental status examinations" to

18   support his opinion that De La Cruz "could perform work that was simple, repetitive, and

19   routine and could not work as part of a team" and that De La Cruz "could have occasional

20   public contact and superficial contact with co-workers."  (See AR 31.)

21          The ALJ found "less persuasive" the medical opinions of examining psychologist

22   Lorraine Schnurr, Ph.D. ("Dr. Schnurr") (see AR 31), treating mental health practitioner

23   Andrea Hans, MFT, ATR ("Hans") (see AR 33), and examining psychologist Laura Catlin,

24   Psy.D. ("Dr. Catlin") (see AR 31-32), and found "not persuasive overall" the joint medical

25   opinion of Hans and therapist Roya Sakhai, Ph.D. ("Dr. Sakhai") (see AR 33-34).

26          Dr. Schnurr, a state agency psychological consultant, conducted a psychological

27   evaluation of De La Cruz on September 29, 2018 (see AR 1048), at which she noted De

28   La Cruz "answered all questions slowly most of the time" (see AR 1050) and "ha[d]

trouble remembering, focusing, and concentrating" (see AR 1053).  As part of her

evaluation, Dr. Schnurr administered formal testing for memory and intelligence, on which

De La Cruz scored in the extremely low range for memory and in the borderline range for

intellectual functioning.  (See AR 1052.)  Based on her evaluation, Dr. Schnurr opined De

La Cruz had "a guarded ability to understand, remember and carry out simple and

complex instructions" and "a poor ability to maintain activities within a schedule and

maintain regular attendance."  (See AR 1053.)  Dr. Schnurr further opined De La Cruz

would have difficulties "maintaining regular attendance and persistence" and "completing

a workday or workweek."  (See AR 1053.)

Hans treated De La Cruz in weekly therapy sessions from March 29, 2019,

through January 10, 2020.  For her "Mental Health Assessment," dated March 29, 2019,

Hans conducted a clinical interview and mental status examination, and found De La

Cruz had severe depressive symptoms, along with moderate symptoms in

"Cognition/Memory/Thought," "Attention/Impulsivity," and "Perceptual Disturbance"; she

found no symptoms in "Socialization/Communication."  (See AR 1097.)  As to functional

impairments, Hans found De La Cruz had severe functional impairments in "School

Performance/Employment," "Self-Care," "Social/Peer Relations," and "Physical Health."

(See AR 1097.)  Thereafter, in a "Client Plan" dated September 13, 2019, Hans assessed

De La Cruz as having severe impairments in social functioning and community life.  (See

AR 1263.)

On September 27, 2019, in a "Mental Impairment Questionnaire," Hans and Dr.

Sakhai, based on "Psychological Evaluations and Reports/Opinions" and "Progress &

Office Notes," including Hans's treatment records starting March 29, 2019, jointly opined

De La Cruz had "overall marked" limitation in understanding, remembering, and applying

information, "overall moderate" limitation in interacting with others, "overall marked"

limitation in concentrating, persisting, or maintaining pace, and "overall marked" limitation

in adapting or managing himself.  (See AR 33, 1158-59.)  They further opined that De La

Cruz would be "off task" 30% of the time, and that he would be "absent from work" four

days or more per month.  (See AR 1160.)

Although, as noted, the ALJ was not persuaded by Hans's opinions, he did cite, without apparent challenge, Hans's treatment records, dated March 29, 2019, to January 10, 2020, and records, dated September 21, 2018, to January 14, 2020, from Pathways to Wellness, a medical clinic at which De La Cruz received treatment.  (See AR 28.)  In Hans's records, she noted De La Cruz consistently experienced auditory hallucinations (see, e.g., AR 1109), albeit with a few periods of improvement (see, e.g., AR 1272).  In the records from Pathways to Wellness, various medical providers also noted De La Cruz consistently experienced auditory hallucinations, e.g., "hear[ing] male and female voices calling his name several times a day" (see AR 1123), "not leav[ing] the house because he starts hearing voices when he does" (see AR 1135), and "endors[ing] hearing male and female voices that say 'discouraging' things to him 3-4 times a week" (see AR 1152).

During the time De La Cruz was being treated by Hans, Dr. Catlin, on October 25, 2019, conducted a psychological evaluation of De La Cruz, which included a clinical interview, mental status examination, multiple formal tests, and a review of his medical records.  (See AR 1218.)  One of the tests was the Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS"), a "brief neurocognitive battery which measures immediate and delayed memory, attention, language, and visuospatial skills."  (See AR 1221.)  On the RBANS, De La Cruz scored in the severely impaired range on both the "Immediate Memory Index" and the "Attention Index," in the moderately impaired range on the "Visuospatial/Constructional Index," in the mildly impaired range on the "Delayed Memory Index," and in the average range on the "Language Index," resulting in an "overall score" in the mildly impaired range.  (See AR 1221-22.)  De La Cruz also "scored a 35 on the [Beck Depression Inventory] indicating symptoms of severe depression."  (See AR 1222.)  In her mental status examination, Dr. Catlin observed De La Cruz's "mood was depressed," his "affect was flat," his "thought content evidenced some perseveration on negative thinking and paranoia," he had "difficulty with his concentration," and both his judgment and insight were "impaired."  (See AR 1220-

21.)  Dr. Catlin opined that, overall, De La Cruz had "marked impairment performing in the workplace."  (See AR 1224.)  Dr. Catlin further opined, as did Hans and Dr. Sakhai, that De La Cruz's impairments would cause him "to be absent from work more than four days a month."  (See AR 1226.)

After considering all of the above-referenced medical opinions and records, the ALJ proceeded to step four, found De La Cruz was "capable of performing [his] past relevant work as a machine packager" (see AR 34), and, based thereon, denied De La Cruz's application (see AR 36).

De La Cruz thereafter requested the Appeals Council ("AC") review the ALJ's decision.  On July 31, 2020, the AC denied review, explaining it had considered the reasons why De La Cruz disagreed with the ALJ's decision and that those reasons "d[id] not provide a basis for changing" the decision.  (See AR 1.)

On August 19, 2020, De La Cruz filed the instant action for review.

## STANDARD OF REVIEW

"An ALJ's disability determination should be upheld unless it contains legal error or is not supported by substantial evidence."  See Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014).  "Substantial evidence is more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  See Hill v. Astrue, 698 F.3d 1153, 1159 (9th Cir. 2012).  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and . . . resolving ambiguities."  See Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

The court "review[s] only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which [the ALJ] did not rely." See Garrison, 759 F.3d at 1010.  Further, it "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence."  See id. at 1009.  "Even when the ALJ commits legal error,"

United States District Court
Northern District of California

1   however, the court must "uphold the decision where that error is harmless," i.e., "if it is

2   inconsequential to the ultimate nondisability determination."  See Treichler v. Comm'r of

3   Soc. Sec. Admin., 775 F.3d 1090, 1099 (9th Cir. 2014).

**DISCUSSION**

5       In his motion for summary judgment, De La Cruz argues the ALJ erred in

6   evaluating the above-referenced medical opinions, essentially, by finding the opinions of

7   Drs. Clanton, Wigton, and Layton more persuasive than the opinions of Hans and Drs.

8   Sakhai, Schnurr, and Catlin.  (See Pl.'s Mot. at 4:10-14.)  De La Cruz further argues the

9   ALJ erred in rejecting his testimony about the severity of his symptoms and in failing to

10   consider the lay witness opinion of his mother, which was provided in a third-party

11   "function report" dated September 11, 2018.  (See Pl.'s Mot. at 18:2-3, 20:14-15.)

12   Consequently, De La Cruz contends, the ALJ's step-three finding that he does not have

13   an impairment meeting or equaling any of the listed impairments and step-four finding

14   that he could perform his past relevant work are not supported by substantial evidence.

15   (See Pl.'s Mot. at 23:12-16, 24:24-25.)  The Court discusses below each asserted error in

16   turn.

17   **A.     Medical Opinions**

18       For applications filed before March 27, 2017, the SSA's regulations set out a

19   hierarchy of medical opinions, requiring an ALJ to "give more weight" to an opinion based

20   on the extent of the doctor's relationship with the claimant.  See 20 C.F.R. §

21   416.927(c)(1)-(2).

22       For applications, like De La Cruz's, filed on or after March 27, 2017, the ALJ need

23   "not defer or give any specific evidentiary weight . . . to any medical opinion[]," see 20

24   C.F.R. § 416.920c(a), and instead must "articulate . . . how persuasive [he/she] find[s] all

25   of the medical opinions," see § 416.920c(b), after considering the following factors:

26   "Supportability," "Consistency," "Relationship with the claimant," and "Specialization," as

27   well as "Other factors," which "include[], but [are] not limited to, evidence showing a

28   medical source has familiarity with the other evidence in the claim or an understanding of

United States District Court
Northern District of California

1   [the SSA's] disability program's policies and evidentiary requirements," see §

2   416.920c(c).  The ALJ must "explain how [h]e considered the supportability and

3   consistency factors,"[8] the two "most important factors," and, "may, but [is] not required to,

4   explain how [h]e considered the [remaining] factors," unless he finds that two or more

5   medical opinions as to the same issue are equally well-supported and consistent with the

6   record "but are not exactly the same."  See § 416.920c(b)(2)-(3).

7           In light of the above-referenced changes to the SSA's regulations, the parties, as

8   an initial matter, disagree as to the standard by which an ALJ is required to evaluate

9   medical evidence.  See Revisions to Rules Regarding the Evaluation of Medical

10  Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (codified at 20 C.F.R.

11  pts. 404, 416).  Subsequent to the filing of their briefs, however, that dispute, as set forth

12  below, has been resolved by the Ninth Circuit.  See Woods, 2022 WL 1195334, at *1.

13          As a result of the above-referenced changes, "longstanding [Ninth Circuit] case

14  law requiring an ALJ to provide 'specific and legitimate' reasons for rejecting an

15  examining [or treating] doctor's opinion" have been "displace[d]."  See id.  Nevertheless,

16  "a medical source's relationship with the claimant is still relevant," and, "an ALJ cannot

17  reject an examining or treating doctor's opinion as unsupported or inconsistent without

18  providing an explanation supported by substantial evidence."  See id., at *6; see also

19  Titus L. S. v. Saul, 2021 WL 275927, at *7 (C.D. Cal. Jan. 26, 2021) (holding court "must

20  determine whether the ALJ adequately explained how he considered the supportability

21  and consistency factors relative to the physicians' opinions and whether the reasons

22  were supported by substantial evidence"); Thomas S. v. Comm'r of Soc. Sec., 2020 WL

23  5494904, at *2 (W.D. Wash. Sept. 11, 2020) (noting "ALJ's reasoning must remain

24  legitimate, meaning lawful or genuine").

25  _____

26      [8] "Supportability means the extent to which a medical source supports the medical
    opinion by explaining the relevant objective medical evidence," and, "[c]onsistency means
27  the extent to which a medical opinion is consistent with the evidence from other medical
    sources and nonmedical sources in the claim."  See Woods, 2022 WL 1195334, at *6
28  (internal quotation, citation, and alteration omitted).

With the above considerations in mind, the Court now turns to the ALJ's evaluation of the above-referenced medical opinions, starting with the opinions he discounted.

### 1.    Dr. Schnurr's Opinion

De La Cruz argues the ALJ erred in rejecting Dr. Schnurr's opinion.  (See Pl.'s Mot. at 12:5.)  As noted, Dr. Schnurr, based on an examination and testing she conducted on September 29, 2018, determined De La Cruz had a "guarded ability to understand, remember and carry out simple and complex instructions" and a "poor ability to maintain activities within a schedule and maintain regular attendance" due to his "depression, sleep problems, memory loss, and reported auditory hallucinations (A/Hs)," and would have difficulties "maintaining regular attendance and persistence" and "completing a workday or workweek" due to his "memory loss, his fights and arguments with others[,] and his A/Hs."  (See AR 1053.)

The ALJ found Dr. Schnurr's opinion "less persuasive" because, according to the ALJ, it was "inconsistent with the longitudinal evidence record."  (See AR 34.)  In that regard, the ALJ found De La Cruz had "minimal reported symptoms of depression [or] auditory hallucinations until he filed for [SSI]," "reported fewer symptoms when on medications," had "generally intact psychiatric examinations," and was able "to handle classroom work at Chabot college, and . . . a baking class."  (See AR 34.)[9]  The ALJ further found Dr. Schnurr's opinion did "not adequately quantify [De La Cruz's] limitations," and that although she "explained that limitations were due to auditory hallucinations and memory loss," such explanation did "not support her opinion."  (See AR 31.)

The Court, as set forth below, finds the ALJ's reasons for rejecting[10] Dr. Schnurr's

---

[9] Based on the same four reasons, the ALJ also rejected the joint opinion of Hans and Dr. Sakhai, and the opinion of Dr. Catlin.  (See AR 34.)

[10] "If an ALJ finds an opinion 'unpersuasive,' and does not account for it in a claimant's RFC, the ALJ has rejected that opinion."  See Scott D. v. Comm'r of Soc. Sec., 2021 WL 71679, at *4 (W.D. Wash. Jan. 8, 2021).  Here, although the ALJ stated he found Dr. Schnurr's opinion "less persuasive," he did not identify any part of her opinion he found persuasive, seemingly did not accept any part of her opinion, and did not

United States District Court
Northern District of California

1    opinion are not supported by substantial evidence.

2        First, if by stating De La Cruz had "minimal reported symptoms" before filing for

3    SSI, the ALJ impliedly found the symptoms on which Dr. Schnurr relied were contrived for

4    purposes of making a claim, the record does not support such finding.  Rather, the record

5    reflects a documented history of mental health problems, including self-harm, suicidal

6    ideation, and hallucinations at least two years prior to the application's filing date of June

7    19, 2018.  (See AR 914 ("Progress Note" dated June 3, 2016, by Taofiq Bello, RN, at

8    Santa Rita Jail) (reporting "acting bizarre," "hearing voices," "taking Seroquel for [an]

9    unknown mental diagnosis"); AR 956 ("Assessment" dated June 7, 2016, by Allen

10   Sanders, MHRS, at Alameda County Behavioral Health Care Services) (reporting "having

11   internal stimulus both auditory and visual," "[t]hought content and tracking conversations

12   are poor," prior diagnosis of "psychotic disorder"); AR 958-59 (evaluation dated June 7,

13   2016, by Mcheko Graves-Matthews, MD, at Alameda County Behavioral Health Care

14   Services) (reporting "very disorganized," "bizarre thoughts," "odd, detached affect,"

15   "[m]uch of what he says makes little sense," "hears messages from the TV," "[f]eels like

16   he can cause things to happen with his mind," "sees various people[,] even friends who

17   are dead," "[h]as difficulty concentrating," "[h]as had paranoid thoughts[,] [such as]

18   thinking people are going to kill him, thinking his whole family would be raped"); AR 791

19   ("Intake/Receiving Screening Form" dated February 21, 2017, by staff at Alameda County

20   Sheriff's Office) (responding "Yes" to question "Does the arrestee appear to have any

21   mental health problems?"; stating "Schizo" in response to directive "Describe"); AR 964

22   ("Assessment" dated February 1, 2018, by Rebecca Perez, AMFT, at Alameda County

23   Behavioral Health Care Services) (reporting "affect appeared flat," "thought process

24   appeared disorganized," "last heard voices and saw things other[s] do not see . . . a

25   couple of days ago"); see also AR 1049 (clinical interview of claimant by Dr. Schnurr)

26   _____

27   account for her opinion in De La Cruz's RFC.  (See AR 31.)  Rather, the ALJ stated his
     RFC assessment is supported by "the opinions of Drs. Clanton, Wigton, and Layton."
28   (See AR 34.)  The ALJ thus rejected Dr. Schnurr's opinion.

United States District Court
Northern District of California

(noting "burned himself at age 13 or 14," "squeezed a cigarette into his palm in 2015").)

Second, although the ALJ points to instances in the record showing De La Cruz's symptoms improved with medication, "'improvement' in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and the nature of [his] symptoms." See Garrison, 759 F.3d at 1017. As the Ninth Circuit has noted, mental health "symptoms wax and wane in the course of treatment" and consequently, "it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." See id.; see also Lester v. Chater, 81 F.3d 821, 833 (9th Cir. 1995) (holding "[o]ccasional symptom-free periods—and even the sporadic ability to work—are not inconsistent with disability"). Here, although the ALJ identified records showing De La Cruz's symptoms were "controlled with current meds" (see, e.g., AR 1057, 1061), the record also shows De La Cruz, even while taking his prescribed medications, continued to experience "breakthrough" auditory hallucinations, ranging from "once [a] week" to "several times a day" (see, e.g., AR 1132, 1136, 1246) (see also AR 1138 (noting "no improvement of AH[11] despite titration of Abilify"), anxiety to an extent that "made him want to start using meth again" (see AR 1245), panic attacks, delusions,[12] and paranoia (see, e.g., AR 1110). In sum, the fact that De La Cruz "ma[de] some improvement does not mean that [his] impairments no longer seriously affect [his] ability to function in a workplace." See Holohan v. Massanari, 246 F.3d 1195, 1205 (9th Cir. 2001); see also Ghanim v. Colvin, 763 F.3d 1154, 1162 (9th Cir. 2014) (finding, where claimant experienced "ongoing depression and auditory hallucinations," observations of "improved mood and energy level" had to "be read in context of the overall diagnostic picture").

---

[11] "AH" is an acronym for auditory hallucinations.

[12] Although, as the Commissioner notes, De La Cruz, at one point, told a Pathways to Wellness pharmacist he had not had any delusions since starting medications, that appointment, contrary to the Commissioner's argument, was not in September 2019 (see Def.'s Mot. at 30:12-14 (citing AR 1117)), but rather on December 11, 2018, after which, he again reported experiencing delusions (see AR 1110).

Third, the record does not support the ALJ's finding of "generally intact psychiatric examinations." (See AR 34); see also Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) (holding "[w]here the purported existence of an inconsistency is squarely contradicted by the record, it may not serve as the basis for the rejection of an examining physician's conclusions"). To support such finding, the ALJ cited to his "discussion under Drs. Clanton and Wig[t]on," which discussion, in turn, relies on a single citation to "Exhibit[]" numbers corresponding to records from Dr. Schnurr, Dr. Catlin, Hans, and Pathways to Wellness, and to "Testimony." (See AR 34 (citing AR 30).) To the extent the ALJ relied on Dr. Schnurr's, Dr. Catlin's or Hans's psychiatric examinations, all three medical sources observed and found impaired functioning, and based thereon, opined that De La Cruz, as discussed above, would have greater limitation performing in the workplace than the ALJ ultimately concluded. See Garrison, 759 F.3d at 1012 (holding to satisfy substantial evidence requirement, ALJ must "do more than state conclusions" and must "set forth his own interpretations and explain why they, rather than the doctors', are correct"). To the extent the ALJ relied on records from Pathways to Wellness, which records contained a mental status checkoff section with the box for "Speech" checked off as "Normal" and the box for "Affect" checked off as "Congruent" (see AR 1152), those records also frequently showed the box for "Affect" checked off as "Constricted" (see, e.g., AR 1057, 1061, 1119), and the box for "Auditory Hallucinations" checked as well (see, e.g., AR 1124, 1132, 1137, 1145). Moreover, the narrative sections of those records provide pertinent details inconsistent with a finding of an "intact" status, e.g., that De La Cruz "does not leave the house because he starts hearing voices when he does" (see AR 1130), "rocks back in [sic] forth while standing" (see AR 1139), "lose[s] focus if he goes for a jog which causes AH to come back" (see AR 1148), "hear[s] male and female voices that say 'discouraging things to him 3-4 times a week" (see AR 1152), and "consistently hear[s] the tv talking to him" (see AR 1250). See Moody v. Berryhill, 2017 WL 3215353, at *10 (N.D. Cal. July 28, 2017) (characterizing as "ambiguous" checked off "'normal' designation" in mental status report; finding designation "not dispositive of

United States District Court
Northern District of California

1    [p]laintiff's mental health as a whole").  To the extent the ALJ relied on testimony given at

2    the hearing, many of the mental status reports that Dr. Layton described as "normal"

3    actually contained findings of abnormal functioning.  (See, e.g., AR 1132 (noting De La

4    Cruz was "[e]xperiencing breakthrough AH"), 1136 (noting De La Cruz "[s]till hears male

5    and female voices calling his name and negative talk several times a day").)

6          Fourth, there is no indication that De La Cruz's limited college attendance (see AR

7    58-59) or participation, while incarcerated, in a baking class (see AR 1298), is

8    transferable to a work setting.  The SSA's RFC assessment is "an assessment of an

9    individual's ability to do sustained work-related physical and mental activities in a work

10   setting on a regular and continuing basis," meaning "8 hours a day, for 5 days a week, or

11   an equivalent work schedule."  See SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

12   "Generally, an ALJ should not consider activities like taking care of oneself, household

13   tasks, hobbies, school attendance, club activities, or social programs to be substantial

14   gainful activities."  See Lewis v. Apfel, 236 F.3d 503, 516 (9th Cir. 2001).  Here, De La

15   Cruz testified he had started attending, on two days per week, three community college

16   classes, each lasting one hour, for a total of six hours per week, namely, weightlifting,

17   health, and psychology, the first in order to "get in shape," and with his family members

18   and the probation department "help[ing] [him] through" the other two.  (See AR 55-60.)

19   (See also AR 1260 (reporting De La Cruz stated "he can read, but [does] not

20   comprehend what he is reading").)  As the Ninth Circuit has observed, "[t]he Social

21   Security Act does not require that claimants be utterly incapacitated to be eligible for

22   benefits," and many activities, such as those here, "are not easily transferable to what

23   may be the more grueling environment of the workplace."  See Fair v. Bowen, 885 F.2d

24   597, 603 (9th Cir. 1989).

25         Fifth, as noted, the ALJ rejected Dr. Schnurr's opinion on the basis that it did not

26   "adequately quantify" De La Cruz's limitations.  (See AR 31.)  "In Social Security cases

27   the ALJ has a special duty to fully and fairly develop the record and to assure that the

28   claimant's interests are considered."  See Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir.

1996) (finding ALJ who rejected doctor's opinions for failure to explain basis "had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them"); see also Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005) (noting ALJ's duty to supplement record is "triggered by ambiguous evidence [or] the ALJ's own finding that the record is inadequate").  Insofar as the ALJ found Dr. Schnurr, an examining consultant retained by the SSA, had, by characterizing De La Cruz's abilities as "guarded" or "poor," inadequately quantified them, the ALJ had a duty to inquire further for purposes of clarification, and, having failed to do so, Dr. Schnurr's opinion should not have been rejected on grounds of inadequate quantification.

Lastly, the ALJ rejected Dr. Schnurr's opinion as to De La Cruz's limitations on the basis that her "expla[nation] that [De La Cruz's] limitations were due to auditory hallucinations and memory loss" did "not support her opinion" because "as discussed under Drs. Clanton and Wig[t]on, the claimant's memory has remained generally intact throughout the record, and the claimant's auditory hallucinations improved with treatment."  (See AR 31.)  Although the above-referenced citation to exhibit numbers and testimony on which said "discussion" relies includes records from Pathways to Wellness with "Intact" checked off as to "Memory" (see, e.g., AR 1057), "[t]he primary function of" such medical records "is to promote communication and recordkeeping for health care personnel," see Orn v. Astrue, 495 F.3d 625, 634 (9th Cir. 2007), whereas Dr. Schnurr's findings as to memory loss were based on the results of formal testing.  Those results, as noted, showed De La Cruz had scores in the extremely low range on a test specifically designed to assess memory (see AR 1052 (showing percentile ranks of 1% or less on all four indices of the Wechsler Memory Scale)), as well as "below average scores in working memory," a finding the ALJ himself acknowledged and relied on in determining De La Cruz's RFC (see AR 28).  See Woods, 2022 WL 1195334, at *6 (defining supportability as "the extent to which a medical source supports the medical opinion by explaining the relevant objective medical evidence").  Moreover, Dr. Schnurr's findings were consistent with Dr. Catlin's findings, the only other psychologist who conducted

1   formal testing for memory, and as discussed earlier herein, the ALJ's assessment as to

2   De La Cruz's auditory hallucinations improving with treatment is not consistent with the

3   record as a whole.

4          Accordingly, for all the above reasons, the Court finds the ALJ erred in rejecting

5   Dr. Schnurr's opinion.

6          **2.     Hans's Opinion**

7          De La Cruz argues the ALJ erred in evaluating the opinion Hans provided on

8   March 29, 2019, wherein Hans, in a section of a "Mental Health Assessment" titled

9   "Targeted Symptoms," checked off "Mod[erate]" as to "Cognition/Memory/Thought,"

10  "Attention/Impulsivity," and "Perceptual Disturbance."  (See AR 1097.)  In evaluating

11  Hans's opinion, however, the ALJ failed to acknowledge Hans's finding as to "Depressive

12  Symptoms," as to which she checked "Severe"; equally importantly, the ALJ

13  mischaracterized Hans's assessment of the above symptoms as an assessment of

14  functional impairments, and thus erroneously found them consistent with his own findings

15  of moderate impairment.  (See AR 33, 1097.)  Moreover, as a result of such erroneous

16  characterization and comparison, the ALJ failed to acknowledge Hans's actual findings

17  under "Functional Impairments," which, as to "School Performance/Employment," "Self-

18  Care," "Social/Peer Relations," and "Physical Health," she checked "Severe."  (See AR

19  33, 1097.)

20         The Commissioner, citing Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012),

21  argues an ALJ "may permissibly reject check-off reports that do not contain any

22  explanation of the bases of their conclusions" (see Def.'s Mot. at 25:23-25 (alteration

23  omitted)), and, in that regard, contends Hans's "recounting" of De La Cruz's history was

24  "merely an isolated portion of the form, separate from the limitations assessed and

25  includes no discussion as to how this history led Hans to make the assessments she did"

26  (see Def.'s Mot. at 25:19-22).  Molina, however, is readily distinguishable on its facts.  In

27  Molina, a physician's assistant completed a form that "instructed her to explain [her]

28  assessments and provide medical or clinical findings to support them, [but she] did not do

United States District Court
Northern District of California

so," and instead provided a vague explanation in "separate medical notes," in which she wrote that "a psychiatrist would likely need to supplement her evaluation."  See Molina, 674 F.3d at 1109.  Here, by contrast, the form Hans used for her opinion contained no such explicit instructions, nor did she rely on separate notes or indicate her evaluation required supplementation.

Rather, in an eight-page cohesive, integrated assessment, Hans documented De La Cruz's symptoms of "psychosis and depression, including auditory hallucinations, sadness, lack of focus, inability to make decisions," and "lack of motivation, difficulty . . . sustaining attention, depressed mood, isolation" and flat affect.  (See AR 1093, 1097.) Based on her entire assessment, Hans then opined as to De La Cruz's functional impairments, and concluded the "[c]riteria for a diagnosis of schizoaffective disorder are met, evidenced by an uninterrupted period of illness during which there is a major mood episode concurrent with Criterion A of schizophrenia," in particular De La Cruz's "[m]ood episode symptoms include depressed mood most of the day, most days, increased appetite, low motivation, difficulty making decisions, feelings of guilt and worthlessness, [and] hyposomnia," and "auditory hallucinations and negative symptoms [are] each present for a significant portion of time during a 1 month period."  (See AR 1093, 1098.)[13]

Accordingly, for all the above reasons, the Court finds the ALJ erred in rejecting Hans's opinion.

### 3.     Hans's "Client Plan"

De La Cruz argues the ALJ erred in failing to consider Hans's "September 13, 2019 [o]pinion."  (See Pl.'s Mot. at 11:21-22); see also 20 C.F.R. § 416.920c(b) (providing SSA "will articulate in [its] determination or decision how persuasive [it] find[s] all of the medical opinions . . . in [claimant's] case record").  As noted, Hans, on September 13, 2019, completed a "Client Plan," which contained a section titled "Impairments of

---

[13] "Negative symptoms" indicating schizophrenia include "blunted affect or loss of personality traits."  See Floyd v. Barnhart, 177 F. App'x 737, 738 (9th Cir. 2006).

United States District Court
Northern District of California

1   Functioning in Daily Living," in which Hans assessed De La Cruz as having "Severe"

2   impairment in "Social function" and "Community Life," and "Moderate" impairment in

3   "Family relationships."  (See AR 1263.)

4          The Commissioner argues the client plan does not constitute a medical source

5   opinion under 20 C.F.R. § 416.913 (see Def.'s Mot. at 26:15-21), which regulation defines

6   "medical opinion" as "a statement from a medical source about what you can still do

7   despite your impairment(s) and whether you have one or more impairment-related

8   limitations or restrictions in" various work-related abilities.  See § 416.913(a)(2).  As the

9   September 13 client plan does not contain either component of said definition, it does not

10  qualify as a medical opinion as defined in the cited regulation.

11         Accordingly, the Court finds the ALJ did not err in failing to consider Hans's "Client

12  Plan."

13         **4.     Hans and Dr. Sakhai's Joint Opinion**

14         De La Cruz argues the ALJ erred in rejecting the findings made by Hans and Dr.

15  Sakhai in the questionnaire they jointly completed on September 27, 2019.  (See Pl.'s

16  Mot. at 7:8.)  In said questionnaire, as noted, Hans and Dr. Sakhai opined that De La

17  Cruz had "overall marked" limitation in understanding, remembering, and applying

18  information; "overall moderate" limitation in interacting with others; "overall marked"

19  limitation in concentrating, persisting, or maintaining pace; and "overall marked" limitation

20  in adapting or managing himself, and, as to each of those four areas of mental

21  functioning, Hans and Dr. Sakhai assessed De La Cruz's degree of limitation in a number

22  of abilities listed thereunder, finding marked limitations in more than half.  (See AR 33,

23  1158-59.)

24         In rejecting Hans and Dr. Sakhai's opinions insofar as they were inconsistent with

25  his step-three finding of moderate limitation in each area of mental functioning (see AR

26  33-34), the ALJ relied on the same initial four reasons discussed above with regard to his

27  rejection of Dr. Schnurr's opinion of September 29, 2018 (see AR 34), which reasons, as

28  set forth above in that discussion, are not adequate grounds for rejection.

United States District Court
Northern District of California

1     The ALJ also found Hans and Dr. Sakhai's explanation that De La Cruz's

2     "symptoms of psychosis impaired [his] focus and thought organization . . . [did] not

3     support their numerous marked restrictions."  (See AR 34.)  As relevant thereto, Hans

4     and Dr. Sakhai found De La Cruz had marked limitation in his abilities to "[i]gnore or

5     avoid distractions," "[w]ork at an appropriate and consistent pace," and "[s]equence multi-

6     step activities."  (See AR 1158-59.)  The ALJ did not elaborate as to why such symptoms

7     do not support those findings.  See Scott D., 2021 WL 71679, at *4 (holding ALJ "must

8     explain his reasoning to allow for meaningful judicial review").

9         Accordingly, for all the above reasons, the Court finds the ALJ erred in rejecting

10    Hans and Dr. Sakhai's joint opinion.

11    **5.    Dr. Catlin's Opinion**

12        De La Cruz argues the ALJ erred in rejecting Dr. Catlin's opinion, which, as noted,

13    was based on the examination and testing she conducted on October 25, 2019.  (See

14    Pl.'s Mot. at 13:7.)  As also noted, Dr. Catlin, based thereon, found De La Cruz had

15    "severely impaired immediate memory and attention" and opined he would have "marked

16    impairment performing in the workplace."  (See AR 29, 1224.)  In support of the latter, Dr.

17    Catlin found De La Cruz had "marked impairment" in fourteen specific areas of work-

18    related mental functioning, and "moderate impairment" in three such areas.  (See AR

19    1225-26.)[14]

---

[14] The fourteen "marked impairment" areas, as listed by Dr. Catlin, are: (1) "ability to understand and remember detailed instruction," (2) "ability to carry out detailed instructions," (3) "maintaining his attention for a two-hour segment," (4) "maintaining regular attendance and being punctual within customary, usually strict tolerances," (5) "work[ing] in coordination with or proximity to others without being unduly distracted," (6) "being able to complete a normal workday and workweek without interruptions from psychologically based symptoms," (7) "trying to maintain an adequate pace and persistence while performing complex/detailed tasks," (8) "interacting appropriately with the general public," (9) "adapting to changes in job routine," (10) "withstanding the stress of a routine workday," (11) "accepting instruction and responding appropriately to criticism from supervisors," (12) "getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes," (13) "interacting appropriately with co-workers, supervisors, and public on a regular basis," and (14) "being aware of normal hazards and tak[ing] appropriate precautions."  (See AR 1225-26.)  The three "moderate impairment" areas are: (1) "ability to maintain adequate pace and persistence to perform simple tasks," (2) "performing at a consistent pace without an unreasonable number and

United States District Court
Northern District of California

1    In rejecting Dr. Catlin's opinions insofar as they were inconsistent with his step-

2    three finding of moderate limitation in each area of mental functioning (see AR 31-32),

3    the ALJ again relied on the same initial four reasons discussed above with regard to his

4    rejection of Dr. Schnurr's opinion of September 29, 2018 (see AR 34), which reasons, as

5    set forth above in that discussion, are not adequate grounds for rejection.

6    The ALJ also found Dr. Catlin's findings were both "internally inconsistent," and

7    inconsistent with contemporaneous treatment records from Hans and Pathways to

8    Wellness (see AR 29), and that her explanation of De La Cruz's symptoms did not

9    "support her findings of multiple marked limitations" (see AR 32).

10    The Court, as set forth below, finds the ALJ's reasons for rejecting Dr. Catlin's

11    opinion are not supported by substantial evidence.

12    First, the ALJ concluded Dr. Catlin's finding that De La Cruz had "severely

13    impaired immediate memory and attention" was inconsistent with "findings from her

14    overall neurocognitive battery test," which "fell in the mildly impaired range." (See AR

15    29.) Although De La Cruz's overall score on the test, the RBANS, was in the mildly

16    impaired range, his specific scores for both immediate memory and attention fell in the

17    severely impaired range and consequently were consistent with Dr. Catlin's finding as to

18    memory and attention. (See AR 1221-22.)

19    Second, the ALJ concluded that contrary to Dr. Catlin's findings of "paranoia and

20    impaired insight and judgment," such impairments were "not present during multiple

21    examinations [by Hans and Pathways to Wellness] in the same time period." (See AR

22    29.) Several months prior however, Hans did record De La Cruz's reporting symptoms of

23    paranoia. (See AR 1110, 1114.) Moreover, as noted, "[t]he primary function" of

24    treatment records such as those prepared by Hans and Pathways to Wellness "is to

25    promote communication and recordkeeping," see Orn, 495 F.3d at 634, whereas the

26

27    _____

28    length of rest periods," and (3) "being able to ask simple questions or request
assistance."  (See AR 1225.)

22

United States District Court
Northern District of California

purpose of the formal testing conducted by Dr. Catlin was to determine and document

any impairments in order to "aid in the assessment of occupational disability and provide

impressions to the [SSA]" (see AR 1226).  In that regard, Dr. Catlin, in her assessment,

explained De La Cruz's paranoia was linked to his auditory hallucinations.  (See AR 1223

(noting "[w]hen De La Cruz was 21 years old he started feeling extremely paranoid[,]

started hearing voices and thought that people were following him and trying to harm

him[,] [and] he stopped hanging out with his friends because eventually he became

paranoid around them too"; further noting "[o]ver the years his psychotic symptoms have

persisted[,] [and] [h]e continues to have auditory hallucinations and at times is so

overwhelmed with paranoia that he cannot leave his house").)  Moreover, even if

Pathways to Wellness did not expressly make reference to paranoia, contemporaneous

records from both Hans and Pathways to Wellness consistently documented De La

Cruz's ongoing auditory hallucinations (see, e.g., AR 1151 (reporting De La Cruz stated

auditory hallucinations were "still present and distracting"), 1263 (reporting De La Cruz

"distance[s] [him]self with family at times, when [he] hear[s] the voices" and "is self-

conscious because of responding to auditory hallucinations")), as well as other abnormal

findings, such as a "constricted" or "blunted" affect (see AR 1273-74), "increased anxiety

in social settings" (see AR 1245), and "[d]isorganized thinking" (see AR 1274).

Lastly, the ALJ concluded Dr. Catlin's "expla[nation] that the claimant had

symptoms of paranoia and impaired concentration that restricted his ability to interact

with others and persist through challenging work assignments . . . does not support her

findings of multiple marked limitations."  (See AR 32.)  Dr. Catlin, as noted, found

fourteen marked impairments, and the ALJ, without further elaboration, rejected all

fourteen of those findings as "not persuasive."  (See AR 31-32.)  The ALJ did not

elaborate as to why said symptoms do not support Dr. Catlin's findings, which included

marked impairment in "interacting appropriately with co-workers, supervisors, and public

on a regular basis" and "maintain[ing] an adequate pace and persistence while

performing complex/detailed tasks" (see AR 1225), and, as noted above, an ALJ "must

United States District Court
Northern District of California

1   explain his reasoning to allow for meaningful judicial review," see Scott D., 2021 WL

2   71679, at *4.

3        Accordingly, for all the above reasons, the Court finds the ALJ erred in rejecting

4   Dr. Catlin's opinion.

5        **6.    Dr. Clanton's and Dr. Wigton's Opinions**

6        De La Cruz argues the ALJ erred by finding persuasive the opinions of Dr. Clanton

7   and Dr. Wigton, neither of whom conducted an evaluation of De La Cruz.  (See Pl.'s Mot.

8   at 15:13-14.)  Both Dr. Clanton and Dr. Wigton, as noted, opined De La Cruz had only

9   moderate limitation in each of the four areas of mental functioning, in contrast to every

10  other medical source who examined De La Cruz.  (See AR 86, 103.)  Dr. Clanton's and

11  Dr. Wigton's opinions were based, respectively, on a review of records De La Cruz had

12  submitted to the SSA as of October 15, 2018, and February 5, 2019, which records did

13  not include the assessments by Hans, Dr. Sakhai, Dr. Catlin, Hans's treatment records,

14  or the majority of treatment records from Pathways to Wellness.  (See AR 77-80, 95-

15  100.)  In support of their opinions, Dr. Clanton and Dr. Wigton cited generally to the

16  medical evidence in the record, and specifically only to "evidence of cooperative

17  behavior" during Dr. Schnurr's consultative examination, "the absence of special

18  education, and evidence that De La Cruz could purchase food at the mall."  (See AR 31

19  (citing AR 87, 103).)  In explaining how he considered the supportability factor, the ALJ

20  then concluded such "explanation supports their opinions."  (See AR 31.)  In explaining

21  how he considered the consistency factor, the ALJ listed various findings from the

22  records in the above-referenced citation to exhibits and testimony, and then concluded

23  his determination of De La Cruz's RFC was "consistent with the opinions of Drs. Clanton

24  and Wigton."  (See AR 30.)

25       With respect to the supportability factor, although Dr. Schnurr described De La

26  Cruz as "cooperative" during her consultative examination, she also found "[h]is affect

27  was flat," that he "had difficulty remembering, after a 20-30 minute delay," and that his

28  "test results indicate a Borderline Intellectual range of functioning, . . . memory loss,

24

anxiety, depression, and possibly neurocognitive deficits" (see AR 1050, 1053), and, the record reflects De La Cruz's significant academic problems since childhood (see, e.g., AR 1219); see also Moody, 2017 WL 3215353, at *10 (noting "a composed and 'normal' demeanor during doctor visits" is not preclusive of disability).  Further, the absence of special education and the ability to buy food at the mall are not directly relevant to an assessment of an individual's work-related limitations in "the more grueling environment of the workplace."  See Fair, 885 F.2d at 603; see also 20 C.F.R. § 416.920c(c)(1) (explaining "[t]he more relevant the objective medical evidence and supporting explanations are," the "more persuasive" the medical opinion is); Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001) (holding that "the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise" does not preclude existence of a disability).

With respect to the consistency factor, Dr. Clanton's and Dr. Wigton's opinions were markedly inconsistent with the opinions of the four other medical sources discussed earlier herein, which opinions were well-supported by clinical interviews, mental status examinations, progress notes from weekly therapy sessions, and formal testing.  See 20 C.F.R. § 416.920c(c)(2) (explaining "[t]he more consistent" a medical opinion is with evidence from other sources, "the more persuasive" it is).  Moreover, the ALJ's explanation that the opinions of Drs. Clanton and Wigton were consistent with his RFC determination, which he based on their opinions, constitutes circular reasoning and not an adequate articulation of consistency as required under the regulations.

Accordingly, for all the above reasons, the Court finds the ALJ erred in finding Dr. Clanton's and Dr. Wigton's opinions persuasive.

**7.    Dr. Layton's Opinion**

De La Cruz argues the ALJ erred by finding "persuasive overall" testimony Dr. Layton gave at the hearing.  (See Pl.'s Mot. at 16:12-13.)  Although the ALJ was not persuaded by Dr. Layton's opinion that De La Cruz "could have occasional public contact and superficial contact with co-workers," he found persuasive Dr. Layton's opinion that

United States District Court
Northern District of California

1  De La Cruz "could perform work that was simple, repetitive, and routine and . . . not . . .

2  part of a team."  (See AR 31.)

3  　　　In explaining how he considered the supportability factor, the ALJ stated "Dr.

4  Layton cited to evidence of [De La Cruz's] low average full scale IQ of 85 and normal

5  mental status examinations at Exhibit 19F/27, 35[15] in support of his findings," and that

6  "[t]his explanation supports his opinion."  (See AR 31.)  As discussed earlier herein,

7  however, many of the records Dr. Layton characterized as "normal" actually reported

8  abnormal functioning, including the latter of the above two records the ALJ specifically

9  referenced.  (See AR 1209 (noting De La Cruz was experiencing "[a]nxiety, compulsive

10  thoughts or behaviors, difficulty concentrating, feeling down, depressed or hopeless,

11  feelings of guilt, little interest or pleasure in doing things and suicidal ideation"); see also,

12  e.g., AR 1132 (noting De La Cruz was "[e]xperiencing breakthrough AH"), 1136 (noting

13  De La Cruz "[s]till hears male and female voices calling his name and negative talk

14  several times a day")).  In addition, although the former of the two records contained a

15  notation as to "normal" orientation, the purpose of that "Internal Medicine Office Visit" was

16  to review x-ray results obtained for a reported cough.  (See AR 1200-01); see also

17  Moody, 2017 WL 3215353, at *10 (finding claimant's "composed and 'normal' demeanor

18  during doctor visits [did] not preclude [claimant] from experiencing anxiety and

19  depression in other contexts").

20  　　　In explaining how he considered the consistency factor, the ALJ, to the extent he

21  found Dr. Layton's opinion persuasive, stated such opinion was consistent with his RFC

22  determination, which circular reasoning, as noted, adds no support to the ALJ's analysis.

23  　　　Further, Dr. Layton was the only medical source to diagnose De La Cruz with

24  "substance-induced psychosis" rather than schizophrenia (see AR 1301).  Dr. Schnurr

25  (see AR 1052), Dr. Catlin (see AR 1222), Hans (see AR 1098), and medical providers

26

27  　　　[15] Exhibit 19F/27 corresponds to AR 1201, and Exhibit 19F/35 corresponds to AR
   1209, which are records from, respectively, an "Internal Medicine Office Visit" and a
28  "Family Practice Office Visit."  (See AR 1200, 1208.)

from Pathways to Wellness (<u>see</u> AR 1055) all diagnosed De La Cruz with schizophrenia, and, both Dr. Catlin in October 2019 (<u>see</u> AR 1224), as well as treating clinicians in February 2018, expressly ruled out "substance-induced mood/psychotic disorder" (<u>see</u> AR 968), a diagnosis Dr. Layton acknowledged he had reviewed (<u>see</u> AR 1314).

Moreover, in contrast to all of the above-referenced medical sources, Dr. Layton's findings were based solely on a review of medical records (<u>see</u> AR 1301), and, although an ALJ is no longer required to "assign presumptive weight based on the extent of the doctor's relationship with the claimant," <u>see</u> <u>Woods</u>, 2022 WL 1195334, at *1, "a medical source's relationship with the claimant is still relevant when assessing the persuasiveness of the source's opinion," <u>see</u> <u>id.</u> at *6.  Indeed, the SSA's regulations provide that it "will consider" several relationship factors, specifically, the "length of time a medical source has treated [the claimant]," the "frequency of [the claimant's] visits with the medical source," the "purpose for treatment [the claimant] received from the medical source," the "kinds and extent of examinations and testing the medical source has performed," and whether the medical source "examine[d] [the claimant rather] than if the medical source only reviews evidence in [the claimant's] folder."  <u>See</u> 20 C.F.R. § 416.920c(c)(3)(i)-(v).  Consequently, although the ALJ was not required to "articulate how" he considered the relationship factors, he nonetheless was required to actually consider them, <u>see</u> § 416.920c(b)(2), and there is nothing in the decision to suggest he did so.

Accordingly, for all the above reasons, the Court finds the ALJ erred in finding Dr. Layton's opinion persuasive.

**B.    De La Cruz's Testimony**

De La Cruz argues the ALJ erred in rejecting his testimony about the severity of his symptoms.  (<u>See</u> Pl.'s Mot. at 18:2-3.)  At the hearing, De La Cruz, as noted, testified he is not "able to work" because he "hear[s] voices," "can't focus," and "ha[s] depression."  (<u>See</u> AR 1291.)  "Once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to the

severity of symptoms merely because they are unsupported by objective medical evidence."  See Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  "Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be 'clear and convincing.'"  See Lester, 81 F.3d at 834.

Here, the ALJ acknowledged medical evidence in the record establishing De La Cruz had "severe impairments," specifically, "unspecified schizophrenia spectrum and other psychotic disorder, unspecified depressive disorder, and borderline intellectual functioning" (see AR 22), and found these impairments "could reasonably be expected to cause the alleged symptoms" (see AR 28).  The ALJ, however, rejected De La Cruz's testimony about the "intensity, persistence and limiting effects" of his symptoms, on the grounds that De La Cruz was taking college classes, could take a college exam and do a group presentation, could drive independently, and, as described by the ALJ, "was able to watch television quite a bit" (see AR 27), and that his symptoms "responded positively to treatment" and were "controlled with medication" (see AR 28).  Additionally, citing various findings in the records of Dr. Schnurr, Hans, and Pathways to Wellness, the ALJ found De La Cruz's testimony was "not entirely consistent with the medical evidence." (See AR 28).

There is no dispute that a claimant's "[e]ngaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination," see Ghanim, 763 F.3d at 1165, or that the allegations of a claimant who "engages in numerous daily activities involving skills that could be transferred to the workplace . . . may [be] discredit[ed] . . . upon [the ALJ's] making specific findings relating to those activities," see Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).  Here, however, De La Cruz's activities, namely, limited college coursework, driving only to familiar places three to four miles away from home, and watching television, are not of a character incompatible with the severity of symptoms De La Cruz alleges, see Ghanim, 763 F.3d at 1164-65 (finding claimant's limited daily activities of "basic chores" and

United States District Court
Northern District of California

"limited socializing" not incompatible with alleged severity of the symptoms and thus not clear and convincing reason to reject claimant's testimony), nor do they demonstrate skills that are transferable to a work setting, see 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(F)(3)(c) (setting forth SSA policy that "if you are able to use an area of mental functioning at home or in your community, [the SSA] will not necessarily assume that you would also be able to use that area to function in a work setting where the demands and stressors differ from those at home"); see also Orn, 495 F.3d at 639 (finding claimant's daily activities of reading, watching television, and coloring not transferable to work setting and thus not clear and convincing reason for rejecting claimant's testimony; finding such rejection not supported by substantial evidence).

Further, as discussed earlier herein, "it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment." See Garrison, 759 F.3d at 1017-18 (finding ALJ who "improperly singled out a few periods of temporary well-being from a sustained period of impairment" did not satisfy "clear and convincing" standard). Here, to the extent the ALJ relied on findings that De La Cruz's symptoms improved to some extent with treatment or medication, such findings do not provide a clear and convincing reason to reject his testimony, particularly when, as noted, De La Cruz continued to experience breakthrough auditory hallucinations and symptoms while taking his prescribed medications.

Lastly, although "[a]n ALJ may reject a claimant's symptom testimony when it is contradicted by the medical evidence," an ALJ "must explain how the medical evidence contradicts the claimant's testimony." See Thomas S., 2020 WL 5494904, at *5. Here, although the ALJ noted De La Cruz's medical records at various times reflected, as described by the ALJ, De La Cruz's "normal speech, a euthymic mood, and an appropriate affect," as well as "linear and logical thought processes, . . . good attention and concentration, [and] intact memory," the ALJ, also noted those records, on other occasions, reported De La Cruz's "flat affect, hallucinations, and self-isolation," as well as "reduced focus and attention." (See AR 28.) Moreover, none of the above medical

1  records contradict De La Cruz's testimony that he is unable to work because he "hear[s]

2  voices," "can't focus," and "ha[s] depression." (See AR 1291).

3       Accordingly, for all the above reasons, the Court finds the ALJ erred in rejecting

4  De La Cruz's symptom testimony.

5  **C.    Mother's Lay Witness Opinion**

6       De La Cruz argues the ALJ erred by failing to discuss, "or even acknowledge" De

7  La Cruz's mother's lay witness opinion, provided in an SSA form titled "Function Report –

8  Adult – Third Party" and dated September 11, 2018. (See Pl.'s Mot. at 20:16); see also

9  AR 300-07. In said report, De La Cruz's mother stated he "does not always

10 comprehend," you "have to repeat [and] ask if he understood," he is a "slow learner,"

11 does not handle stress well, has to be reminded to shower and take his medications,

12 shops only with his parents and for groceries, does not prepare his own meals, and does

13 not pay any bills or handle any checking or savings accounts. (See AR 300-306.)

14 Further, in response to the question, "Does this person have any problems getting along

15 with family, friends, neighbors, or others?" she answered "Yes" and in response to the

16 directive "If 'YES,' explain," stated "When he is on [sic] one of those moods, [you] cannot

17 talk to him [be]cause he does not listen or hear what you are saying." (See AR 305.)

18 Additionally, she stated he "pretty much got fired several times or at all jobs he has had"

19 and that "one said he was slow." (See AR 306.)

20       The Ninth Circuit has held that "friends and family members in a position to

21 observe a claimant's symptoms and daily activities are competent to testify as to [the

22 claimant's] condition" and that "[d]isregard of this evidence violates the Secretary's

23 regulation that he will consider observations by non-medical sources as to how an

24 impairment affects a claimant's ability to work." See Dodrill v. Shalala, 12 F.3d 915, 919

25 (9th Cir. 1993). Consistent therewith, "[l]ay testimony as to a claimant's symptoms" is

26 deemed "competent evidence that an ALJ must take into account, unless he or she

27 expressly determines to disregard such testimony and gives reasons germane to each

28 witness for doing so." See Lewis, 236 F.3d at 511; see also Nguyen, 100 F.3d at 1467

United States District Court
Northern District of California

1    (holding lay witness testimony "*cannot* be disregarded without comment") (emphasis in

2    original).  Here, the Commissioner, while conceding the ALJ did not consider the

3    mother's third party function report (see Def.'s Mot. at 31:6), argues "no harm came from

4    the ALJ's failure to discuss this report" because the facts therein were not "material" or

5    were "represented elsewhere in evidence the ALJ did discuss" (see Def.'s Mot. at 31:12-

6    17).  Contrary to the Commissioner's characterization of the record, however, the

7    mother's third party function report provided unique and material detail with respect to De

8    La Cruz's day-to-day behavior and corroborated other evidence in the record

9    demonstrating De La Cruz's marked impairments.

10        Accordingly, the Court finds the ALJ erred in disregarding the function report

11   without comment.

12   **D.      ALJ's Step-Three Finding**

13        As set forth above, the ALJ erred in evaluating the medical opinions, in rejecting

14   De La Cruz's testimony, and in failing to consider his mother's lay witness opinion.  De La

15   Cruz contends that as a result of those errors, the ALJ's step-three finding that he did not

16   have an impairment meeting or equaling any of the listed impairments, specifically, by

17   failing to satisfy either the paragraph B criteria or the paragraph C criteria, was not

18   supported by substantial evidence.  (See Pl.'s Mot. at 23:12-16.)  As discussed below,

19   the Court agrees.

20        In concluding De La Cruz's impairments failed to satisfy the paragraph B criteria,

21   the ALJ discounted every marked limitation finding set forth in consistent and well-

22   supported opinions of medical sources who either treated or examined De La Cruz, and

23   he credited the opinions of medical sources who found only moderate limitations based

24   solely on a review of various records. (See AR 25.)  In so finding, the ALJ, as discussed

25   in detail earlier herein, erred by "fail[ing] to proffer any legitimate reason specifically

26   addressing why . . . [said] marked limitation conclusions (and *only* such conclusions)"

27   were not persuasive.  See Baladad v. Saul, 2020 WL 1503654, at *14 (N.D. Cal. Mar. 30,

28   2020).  As noted, Hans, Dr. Sakhai, and Dr. Catlin each opined De La Cruz had marked

United States District Court
Northern District of California

1   limitation in at least two of the four areas of mental functioning, and they, along with Dr.

2   Schnurr, also opined he would not be able to maintain regular attendance at work due to

3   his mental impairments.  Had the ALJ accepted their medical opinions, De La Cruz's

4   impairments would have satisfied the paragraph B criteria, which as to Listings 12.03,

5   12.04, and 12.11, is, as discussed earlier herein, sufficient to require a finding of

6   disability.

7           Moreover, the ALJ also erred in concluding De La Cruz's impairments failed to

8   satisfy the paragraph C criteria, which, if met, likewise by themselves suffice to require a

9   finding of disability under Listings 12.03 and 12.04.  In that regard, the ALJ found, without

10   further elaboration or analysis, De La Cruz "has not had medical treatment, mental health

11   therapy, psychosocial support, a highly structured setting that is ongoing, or a minimal

12   capacity to adapt to changes in environment or to demands that are not already part of

13   daily life."  (See AR 25.)  An ALJ "err[s] by failing to analyze or discuss the paragraph C

14   criteria."  See Jessica B. v. Comm'r of Soc. Sec., 2019 WL 850954, at *6 (E.D. Wash.

15   Jan. 30, 2019).  Here, the ALJ not only did no more than list the criteria's requirements

16   and arrive at a conclusion, his conclusion is, as discussed in detail above, contradicted

17   by the record and, indeed, by other parts of his decision as well.  (See, e.g., AR 28

18   (acknowledging "treatment notes" from Pathways to Wellness and "medication" for

19   "[s]ymptoms of schizophrenia"), 33 (referring to De La Cruz's "Family Therapist").)  The

20   Commissioner, pointing to college classes, "normal" mental status examination results,

21   and "improve[ment] with treatment" (see Def.'s Mot. at 12:16-20), argues that "even if . . .

22   the ALJ wrongly stated that [p]laintiff did not have ongoing structured mental health

23   treatment . . . , any such error is harmless because [p]laintiff still cannot show he meets

24   all the required criteria," specifically, that De La Cruz "has minimal capacity to adapt to

25   changes" (see Def.'s Mot. at 13:4-7).  For the same reasons set forth earlier herein,

26   however, such circumstances are not sufficient to support a finding that De La Cruz has

27   more than a minimal capacity to adapt to changes, and Hans, Dr. Sakhai, and Dr. Catlin,

28   whose opinions the ALJ, as discussed earlier herein, erroneously rejected, all opined De

La Cruz has only "minimal capacity to adapt to changes in the environment or to demands that are not already part of his life." (See AR 1161, 1224.)

Accordingly, the Court finds the ALJ's step-three finding was not supported by substantial evidence.

**E.    RFC**

Even assuming, arguendo, the ALJ did not err in his step-three finding, the record supports a finding of disability at step four. In determining De La Cruz's RFC before proceeding to step four, the ALJ, as noted, found De La Cruz would be "off task less than 10% of an eight-hour workday and absent once per month" (see AR 27), a finding contrary to Dr. Schnurr's opinion that he would have "difficulty completing a workday or workweek" (see AR 1053), Hans and Dr. Sakhai's opinion that he would be off-task "30%" of the time and absent "4 days or more" per month (see AR 1160), and Dr. Catlin's opinion that De La Cruz's "impairments will cause him to be absent from work more than four days a month" (see AR 1226), all of which the ALJ, as discussed above, erred in rejecting. As noted, the VE testified there would not be "any work in the national economy" for an individual who was off-task 10% of the time and absent more than once per month. (See AR 69.) Consequently, had the ALJ accepted the above-referenced medical opinions, De La Cruz's RFC, according to the VE, would have precluded all employment, necessitating a finding of disability at step four.

**F.    Remedy**

De La Cruz requests the Court remand his claim for an award of benefits, or, in the alternative, for further proceedings.

A district court ordinarily remands for an award of benefits only where the following three requirements are met: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand," and, even where those

requirements are met, such court retains "flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." See <u>Garrison</u>, 759 F.3d at 1020-21.

Here, the Court finds the record, consisting of more than 1,300 pages and comprising opinions from seven different medical sources, transcripts of two separate hearings before the ALJ, and treatment records spanning nearly ten years, has been fully developed, and, that further administrative proceedings would serve no useful purpose. Additionally, as set forth earlier herein, the ALJ failed to provide legally sufficient reasons for rejecting the opinions of four medical sources, the mother's lay witness opinion, and the testimony of the claimant.  Lastly, if such evidence were credited, the ALJ would be required to find De La Cruz is disabled.

Accordingly, the above-titled action will be remanded for an award of benefits.

## CONCLUSION

For the reasons set forth above, De La Cruz's motion for summary judgment is hereby GRANTED, the Commissioner's cross-motion for summary judgment is hereby DENIED, and the action is hereby REMANDED, pursuant to sentence four of 42 U.S.C. § 405(g), for an immediate award of benefits.

**IT IS SO ORDERED.**

Dated: May 17, 2022

MAXINE M. CHESNEY
United States District Judge